UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

JEFFREY MILLER                              CIVIL ACTION NO. 07-cv-1282

VERSUS                                      JUDGE STAGG

WARDEN BURL CAIN                            MAGISTRATE JUDGE HORNSBY

**REPORT AND RECOMMENDATION**

**Introduction**

Jeffrey Miller ("Petitioner") shot and killed one of his friends. The State charged him with second degree murder. Petitioner argued that the shooting was justified as self-defense and, in the alternative, that he was at most guilty of manslaughter. A Caddo Parish jury convicted him of second degree murder, and a mandatory life sentence was imposed. The state court affirmed the conviction and sentence on direct appeal. State v. Miller, 868 So.2d 239 (La.App. 2d Cir. 2004), writ denied, 883 So.2d 1027 (2004). Petitioner also pursued state post-conviction relief.

He then filed this federal habeas corpus petition and presented three issues: (1) the jury should not have received an instruction on the aggressor doctrine, (2) there was insufficient evidence of guilt because the coroner who performed the autopsy did not testify at trial, and (3) ineffective assistance of counsel for failure to investigate and pursue insanity or intoxication defenses and for failure to object to the aggressor doctrine instruction. It is recommended, for the reasons that follow, that the petition be denied.

**Background Facts**

Petitioner was in his apartment on the evening of December 23, 2000 watching a movie with three friends when the victim, Warren "Hank" Hewitt arrived and joined them. Petitioner and Hewitt had attended high school together.  Hewitt was carrying a wine bottle and was noticeably intoxicated, loud, and obnoxious.

Later, two of the friends left the apartment.  Petitioner, Hewitt and Quin Moody remained.  Moody was the only eyewitness who testified at trial about the confrontation that led to the shooting.  His testimony appears at Tr. 242-85.

Moody testified that Petitioner was drinking that night but was not drunk.  He described Petitioner, whom he called "Big Mike," and Hewitt as both "nice size fellows" about equal in size.  Petitioner had worked as a bouncer at the Player's Club.

Moody testified that Petitioner and Hewitt began to talk "trash" to each other, trading playful insults.  Hewitt challenged Petitioner to slap box, and Petitioner accepted.  Hewitt took off his jacket and shoes, and the men began a game of slap boxing.  At one point, Hewitt swung, missed, and fell.  He got up, and the two men "tangled a minute."  Using his closed fist, Hewitt hit Petitioner in the face with a "solid lick," after which Petitioner grabbed and held Hewitt, who struggled to get loose.  Petitioner asked Hewitt if he was serious and was trying to fight "for real."  Hewitt told Petitioner to get off of him.  Petitioner did, and he went in the kitchen.

Petitioner picked up his nine millimeter pistol[1], which was on his refrigerator. Meanwhile, Hewitt "had got up and was coming towards [Petitioner]."  Hewitt was not armed, and he was not holding the wine bottle he had drank from earlier or any other weapon.  Petitioner pointed the pistol at Hewitt, but Hewitt "was steady coming towards him."  Moody testified that the men were "crossing words" as Hewitt walked towards Petitioner.  When the men were about eight feet apart, Petitioner shot Hewitt once in the neck area, and Hewitt fell to the floor.

Kendra Dickson, Petitioner's neighbor, testified that she talked to Petitioner on the phone just before the shooting.  Petitioner told her that his group was just laughing and joking around, and he was about to slap box.  Ms. Dickson started to join the group at the neighboring apartment, but she soon heard a thump like someone had fallen, followed by some loud talking and a gunshot.  Petitioner soon knocked on her door and asked her to call the police.  He said "Kendra, baby, call the police, I just shot this n*****."  Ms. Dickson turned around in her kitchen to get the telephone and make the call.  When she turned back around, Petitioner was gone.

Ms. Dickson testified that she soon heard some yelling and more gunshots being fired. She estimated that those shots were fired no less than five and no more than 10 minutes after the first gunshot.

---

[1] A police officer who collected crime scene evidence identified the weapon (according to the transcript) as a "Virginia nine millimeter." Tr. 204.

Petitioner then returned to Ms. Dickson's apartment and asked her to get the gun out of his hand.  She retrieved one of her "hair wares" from the bathroom, wrapped it around the gun, and took it from Petitioner.  She then walked next door and saw the victim on the floor. Petitioner followed her, and he stood over the body and started yelling and punching the body in the face.  Petitioner was yelling things like, "N*****, I told you not to do this," and, "I told you not to hit me like this."  Tr. 291-323.

Dr. George M. McCormick, II, the Caddo Parish Coroner and a forensic pathologist, testified that the autopsy of the victim was performed by Dr. Steven Cogswell, who was at the time the Chief Deputy Coroner and also a board certified forensic pathologist.  Dr. McCormick testified that he was familiar with the autopsy results, which included a finding that the victim had a "very large amount" of alcohol in his system that was past the point of legal intoxication and "even a fatal amount."  The report listed the victim's blood alcohol level at 0.452%.  He added that some persons can tolerate an amount of alcohol that would kill other people.

Dr. McCormick testified that the victim was shot nine times.  One bullet entered the chin, exited and went into the neck and then into the chest.  It struck the victim's left lung and aorta.  The angle of that wound indicated to Dr. McCormick that it was fired when the victim had his head down and he was bent forward at the waist or else the shooter was very high above him.  The angle of entry of the other eight bullet wounds indicated that the shooter was either sitting on the floor shooting up at the victim or (consistent with the

testimony) the victim was lying on the floor and the shooter was standing over him at an angle.

Dr. McCormick testified that the shot that entered the chin was a "fatal wound" but would not have caused immediate death.  The victim would have bled from his aorta and, without prompt medical attention, it would have caused his death within five to 10 minutes at the outside.  McCormick added that the other wounds were made while the victim was still alive, as evidenced by hemorrhage associated with them.  One of the later-fired shots would have been immediately fatal.  It entered the head from the right side of the jaw and cut the brain stem.  Tr. 346-70.

**Jury Instruction**

**A. State Court Proceedings**

The court's oral instructions to the jury were not transcribed (Tr. 534), but the written instructions that the court read are part of the record.  Tr. 112.  The court charged the jury with the elements of second degree murder and manslaughter.  It also instructed the jury regarding the statutory provisions for justifiable homicide (self-defense), which requires evidence that the homicide was committed by a person who reasonably believed that he was in eminent danger of losing his life or receiving great bodily harm and that the killing was necessary to save himself from that danger. La. R.S. 14:20. The court also charged the jury with the statutory provision of La.R.S. 14:21:  "A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict

in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict."  Tr. 121.

After the instructions were read to the jury, defense counsel Hersy Jones objected to the aggressor instruction on the grounds that there was no evidence Petitioner was the aggressor.  The trial judge overruled the objection, noting the lack of prior objection and explaining that it was "a standard jury instruction" in a violent offense trial.  As for whether there was evidence Petitioner was the aggressor, the judge said that the evidence "is what it is" and that he was required to instruct the jury on the appropriate law and let them find the facts.  Tr. 534-37.

Petitioner argued on direct appeal that the trial court erred in including the aggressor doctrine in the jury charge.  The appellate court found that the evidence showed beyond a reasonable doubt that Petitioner's first fatal shot was not in lawful self-defense.  The victim may have become more violent as the events progressed, but the sober Petitioner was able to pin down the drunk victim and warn him that his blow with a fist had gone too far.  Furthermore, Petitioner could not have reasonably believed that he was in eminent danger of death or great bodily harm when he fired the first shot.  Petitioner had been able to bring the situation under control, withdraw from the fight and leave the room.  He then injected a pistol into the fray, from which a jury could reasonably conclude that Petitioner had assumed the role of aggressor.  Accordingly, the ruling of the trial court to include the aggressor doctrine in the jury charge was held to be correct.  State v. Miller, 868 So.2d at 243-44.

### B. Applicable Federal Law

The Constitution requires the State to prove every element of an offense, and a jury instruction violates due process if it fails to give effect to that requirement.  Sandstrom v. Montana, 99 S.Ct. 2450 (1979).  But not every ambiguity, inconsistency, or mistake in a jury instruction rises to the level of a due process violation.  An incorrect instruction must have so infected the entire trial that the resulting conviction violated due process.  Estelle v. McGuire, 112 S.Ct. 475 (1991).  The challenged instruction may not be judged in isolation, but must be viewed in the context of the overall charge.  Middleton v. McNeil, 124 S.Ct. 1830 (2004).  And a habeas petitioner faces an "especially heavy burden" when he seeks to show constitutional error from a jury instruction that quotes a state statute.  Waddington v. Sarausad, 129 S.Ct. 823, 831 (2009).  The mere "slight possibility" that the jury misapplied an instruction is not enough to merit vacating the conviction.  Id. at 832.

Federal habeas relief is not available unless the state court's adjudication of this constitutional claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  The state court's application of governing federal law must be shown to be not only erroneous but objectively unreasonable.  Middleton, 124 S.Ct. at 1832.

### C. Analysis

Petitioner argues that the aggressor instruction essentially told the jury not to consider his justifiable homicide defense based on self-defense.  Petitioner then argues at length,

based on the facts and his interpretation of them, that he was not an aggressor in the encounter. The undersigned sees nothing in the charge that told the jury to disregard Petitioner's self-defense theory or that relieved the State of its burden on any issue.  The jury was given a charge regarding the elements of second degree murder, self-defense, and the aggressor doctrine, and it was up to the jury to decide whether each applied or not.

The jury might have decided that Petitioner was an aggressor and not entitled to self-defense. Or it might have decided that Petitioner was not an aggressor but simply had not established the elements of justifiable homicide.  As the state appellate court noted, there was strong evidence that Petitioner was not reasonably in fear that his drunk and unarmed friend was about to kill him or inflict great bodily harm so that it was necessary to kill the victim to save himself from that danger.  Nothing in the aggressor instruction relieved the State from proving each element of the crime beyond a reasonable doubt, and there was a reasonable basis to give the instruction in this case and allow the jury to determine its applicability. Petitioner has not shown that the state court's adjudication of this issue was an unreasonable application of any clearly established Supreme Court precedent.

**Coroner's Testimony**

Petitioner lists as an issue in his federal petition that the evidence was insufficient to prove guilt of second degree murder because the coroner who performed the autopsy did not testify.  Petitioner's brief devotes much of its argument on this issue to a contention that the state court committed a procedural error regarding this claim in the post-conviction

application process.  Such issues are not cognizable on habeas review.  Rudd v. Johnson, 256 F.3d 317, 319 (5th Cir. 2001).

Petitioner argues that the State, by not calling as a witness the actual deputy coroner who performed the autopsy, did not properly prove the death of the victim and the cause of death. The state trial judge denied this claim when it was presented on a post-conviction application.  Judge Mosely noted that the deputy coroner who performed the autopsy had since moved to another state, and Dr. McCormick testified based on the written report.  Judge Mosely cited Louisiana law that excepts a coroner's report from the hearsay rule and allows it to prove death and the cause thereof.  State law also permits the coroner or one of his deputies to testify about those issues in a homicide prosecution even when the testifying witness did not perform the autopsy or prepare the report. Tr. 1328-B.  The state appellate court rendered the last reasoned decision on the issue.  It merely added that state law foreclosed the claim absent a showing that the coroner had testified outside the findings in the autopsy report or the scope of his expert opinion, and Petitioner had not made such a showing.  Tr. 1358.

Petitioner has not demonstrated that these procedures ran afoul of any clearly established Supreme Court precedent. Dr. McCormick's testimony, along with that of eyewitnesses, more than proved that (1) the victim was dead and (2) he died of gunshot wounds inflicted by Petitioner.  Petitioner also argued in state court that the inability to cross-examine the deputy coroner who performed the autopsy report violated Crawford v.

<u>Washington</u>, 124 S.Ct. 1354 (2004), but Petitioner did not squarely present that issue in his federal habeas petition and memorandum. He mentions it briefly in a reply memorandum, but issues may not be raised for the first time in a reply. The court will not condone or reward such sandbagging tactics. Petitioner could have easily included the issue in his 56-page petition and memorandum if he was serious about pursuing it. Furthermore, Coroner McCormick was subject to cross-examination about the report, and it was never attacked for any lack of accuracy.  Petitioner is not entitled to habeas relief on this issue.

**Ineffective Assistance of Counsel**

### A. Introduction

Petitioner argues that his trial counsel was ineffective for a number of reasons. Petitioner bears the burden of proving two components, deficient performance and prejudice, to establish ineffective assistance of counsel.  Counsel's performance was deficient only if he made errors so serious that, when reviewed under an  objective standard of reasonable professional assistance and afforded a presumption of competency, he was not functioning as the "counsel" guaranteed by the Sixth Amendment.  <u>Strickland v. Washington</u>, 104 S.Ct. 2052, 2064 (1984).  Prejudice exists only if there is a reasonable probability that, but for the error, the result of the trial would have been different.  A reasonable probability is one sufficient to undermine confidence in the outcome.  <u>Id</u>. 104 S.Ct. at 2068.

The test for habeas purposes is not whether a petitioner made the showing required under <u>Strickland</u>. The test is whether the State court's decision – that the petitioner did not

make the Strickland showing – was so incorrect as to be contrary to, or an objectively unreasonable application of, the standards provided by Strickland's clearly established federal law. Wiggins v. Smith, 123 S.Ct. 2527, 2535 (2003); Williams v. Taylor, 120 S.Ct. 1495 (2000); Henderson v. Quarterman, 460 F.3d 654, 665 (5th Cir. 2006).

**B. Late Objection to Jury Instruction**

Petitioner's list of issues includes the claim that counsel was ineffective for not timely objecting to the jury instruction on the aggressor doctrine.  Petitioner's memorandum states at one point that he is not addressing that claim here, but in other places Petitioner mentions the claim.  In any event, the claim lacks merit.  Counsel did object to the jury charge after it was given, and the discussions with the court give every indication that the trial judge was of the strong opinion that the charge was appropriate so that an earlier objection would not have had any likelihood of removing the aggressor instruction. As noted above, the instruction did not automatically deprive Petitioner of his defense or relive the prosecution of any burden. There is no reasonable probability that, if only counsel had raised the same objection earlier in the case, the jury instruction would have been omitted or the resulting verdict would have been different.

**C. Intoxication Defense**

Petitioner argues that counsel was ineffective because he did not pursue an intoxication defense.  The trial court's instructions to the jury included a charge regarding intoxication, See La. R.S. 14:15, but there was simply no evidence to support that defense,

which is very demanding.  Witnesses testified that the victim was highly intoxicated, but they said that Petitioner was not drunk.  The state court's rejection of this claim was not an objectively unreasonable application of the Strickland principles.  Counsel is not ineffective for failing to create a defense when there is no factual support.

### D. Insanity Defense

Petitioner next claims that counsel was ineffective because he did not investigate and present an insanity defense.  Counsel did early in the proceedings file a notice of defense based on mental illness (Tr. 68), but he apparently chose not to pursue that very difficult defense at trial. Many trial lawyers are of the reasonable opinion that an insanity defense risks angering a jury so it should not be pursued unless there is plentiful evidence to support it. The defense would require that Petitioner suffered from a mental disease or defect so that he was incapable of distinguishing between right and wrong with reference to his conduct. La.R.S. 14:14.

The state trial judge, citing the applicable Strickland standard, rejected this claim based on a finding that Petitioner failed to provide any factual basis or evidence to support his contention.  Tr. 1438-39.  The state appellate court issued the last reasoned decision on the issue.  It relied on the prejudice prong, stating that Petitioner had not demonstrated a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different.  Tr. 1436-37.

Petitioner states in his memorandum that *after* he was convicted and transferred to Angola, he was prescribed the medication Risperdal.  Petitioner then reasons that Risperdal is indicated for treatment of schizophrenia, which is a well-known form of insanity.  The mere fact that Petitioner was prescribed a drug *after* his conviction and that drug *may* be prescribed for schizophrenia does not retroactively render counsel incompetent for not presenting an insanity defense. Petitioner also states that he was taking Wellbutrin, but that it is a common antidepressant medication taken by a large segment of the population. There is no indication that defense counsel was made aware of that fact, and counsel would not be branded as ineffective if he did not employ any such knowledge to risk an insanity or intoxication defense based on Petitioner being prescribed a medicine. The state court did not unreasonably apply <u>Strickland</u> in its assessment of this final claim.

Accordingly,

**IT IS RECOMMENDED** that Petitioner's petition for writ of habeas corpus be **denied**, and that his complaint be **dismissed with prejudice**.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within seven (7) days after being served with a copy thereof.  Counsel are

directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 28th day of April, 2010.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE